UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

EARL D. OSBORNE, JR.,

        Plaintiff

v.                             Civil Action No. 2:02-1250

THE HONORABLE CHARLES E. KING, JR.,
THE HONORABLE PAUL ZAKAIB, JR.,
THE HONORABLE TOD J. KAUFMAN,
THE HONORABLE JAMES C. STUCKY,
THE HONORABLE HERMAN C. CANADY, JR.,
THE HONORABLE IRENE C. BERGER,
THE HONORABLE LOUIS H. BLOOM,
Judges, Thirteenth Judicial Circuit,
Kanawha County, West Virginia,

        Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are plaintiff Earl D. Osborne's ("Osborne") motions (1) to amend the complaint to add a request for reinstatement to his former position, and (2) to reinstate claims previously ordered dismissed in this case, filed December 12, 2005, and defendants' ("the judges") renewed motion to dismiss, filed December 22, 2005.

I.

Plaintiff Earl D. Osborne was appointed to the position of Home Incarceration Supervisor of the Kanawha County Home

Incarceration Program on February 21, 1997.  (Compl. at ¶ 1.)

Osborne was employed by the County Commission of Kanawha County,

with the approval of the judges, and supervised by former Sheriff

Dave Tucker.  (<u>Id.</u> at ¶ 2.)  This somewhat unusual employment and

oversight authority is mandated by West Virginia Code section 62-

11B-7a:

> The county commission may employ one or more persons
> with the approval of the circuit court and who shall be
> subject to the supervision of the sheriff as a home
> incarceration supervisor or may designate the county
> sheriff to supervise offenders ordered to undergo home
> incarceration and to administer the county's home
> incarceration program.

W. Va. Code § 62-11B-7a.

On October 12, 2001, the judges entered an order

purporting to divest plaintiff of his position.  (<u>Id.</u> at ¶ 5.)

The "Administrative Order" entered by the judges provides as

follows:

> WHEREAS, numerous complaints have been received
> from persons within the judiciary, offenders, and other
> persons relating <u>to the conduct of Earl Osborne as the
> home incarceration supervisor and the manner in which
> he administers the program, some of which are
> potentially subject to investigation</u>; and
>
> WHEREAS, <u>it was reported</u> that the home
> incarceration supervisor, Earl Osborne, has, on at
> least one occasion, <u>while speaking with an officer of
> the Court in regards to an offender undergoing home
> incarceration, uttered a racial slur while referring to
> such offender as "just a no-good nigger"</u>; and

2

WHEREAS, Sheriff Dave Tucker, as a supervisor of the home incarceration supervisor, Earl Osborne, was advised by the office of the Prosecuting Attorney of Kanawha County of said incident; and

WHEREAS, neither Sheriff Dave Tucker or the office of the Prosecuting Attorney of Kanawha County reported that incident concerning the home incarceration supervisor, Earl Osborne, to this Court nor did they officially communicate with the Court about any subsequent investigation of the home confinement program and or it's supervisor, Earl Osborne, notwithstanding this Court's obvious interest in the appropriate administration of said program; and

WHEREAS, the Court is of the opinion that the only investigation conducted by Sheriff Dave Tucker of Kanawha County relating to said incident was an internal investigation conducted without objectivity and which was biased and unreliable; and

WHEREAS, the numerous complaints relating to the administration of the home incarceration program on the part of the Kanawha County Sheriff's Department and the home incarceration supervisor, Earl Osborne, have eroded the Court's confidence in such program to such a degree that it has, therefore, been effectively taken away from the Court as a means of alternative sentencing;

Now, THEREFORE, based on the foregoing, it is ORDERED and ADJUDGED that Earl Osborne be relieved forthwith as the supervisor of the home incarceration program and that he be removed from the payroll of said program as approval of such employment is hereby denied.

(Order, attached as Ex. B. to Compl. (emphasis supplied)).  The

order is signed by each of the judges.

On October 12, 2001, pursuant to the order, Sheriff

Dave Tucker and the County Commission of Kanawha County removed

3

Osborne from his position and terminated his employment.   (Id. at
¶ 6, 7).   The order received coverage in the local news media.

On November 9, 2001, Osborne informed the defendants
that their actions were in violation of the Constitutions and the
laws of the United States of America and West Virginia inasmuch
as his termination was effected without notice and opportunity to
be heard:

> Mr. Osborne has been denied all of his due process and
> equal protection rights under the Federal and State
> Constitutions, his rights under Federal and State
> administrative procedure laws, his governmental
> employment rights, and his rights to administrative due
> process and equal protection of the laws.

(Id. at ¶ 9; Letter attached as Ex. C to Compl.)   Osborne further
demanded that defendants grant him his rights as follows:

> Mr. Osborne demands his rights as stated.   Accordingly,
> Mr. Osborne demands from the Circuit Court, from the
> Sheriff of Kanawha County, and the Kanawha County
> Commission a notice and full statement of the charges
> against him.   Mr. Osborne demands an opportunity to
> protest the charges brought against him.   Mr. Osborne
> demands a hearing on the charges, at which he will be
> afforded the opportunity to confront the charges and
> any witnesses against him.   Mr. Osborne demands an
> opportunity to refute the charges, which incidently he
> does.   Mr. Osborne demands the right to have the
> assistance of counsel.   Mr. Osborne demands the right
> to contest the charges, the termination of his
> employment, and any penalty imposed.

(Id.)   Osborne claims that defendants have refused to recognize
any of these rights.   (Compl. at ¶ 10.)

4

On October 15, 2002, Osborne initiated this action. He alleged he "had both a property and liberty interest in continued employment . . . ." (Compl. ¶ 3.)  The complaint further alleges Osborne's entitlement, <u>inter</u> <u>alia</u>, to "due process[,]" an "opportunity . . . to protest . . . [and] . . . for . . . a hearing . . . ."  (<u>Id.</u> ¶ 8).  Specifically, Osborne:

> seeks to refute and defend against any charges against him with the Affidavit of Ben Browning . . . the Affidavit of R.D. Evans . . . with the Affidavit of Earl D. Osborne . . . and with the Report of the internal investigation by the Office of the Sheriff of Kanawha County . . and with the testimony and evidence of those witnesses in open hearing, all of which exonerate the Plaintiff from the charges and allegations made against him.

(<u>Id.</u> ¶ 11).  The referenced affidavits attempt to refute the allegations concerning the racial slur and are designed to defend Osborne against the badge of racism.  Osborne alleges that, as a result of the events surrounding his termination, he was "publically defamed" and that the affair has "caused irreparable damage to his reputation as a person and law-enforcement officer . . . ."  (<u>Id.</u> ¶ 14).

In his recently filed motion to reinstate claims, Osborne discusses a forerunner of this litigation previously commenced in state court:

[P]rior to the filing of . . . [this civil action] . . . . the plaintiff had . . . pursued his rights and remedies in a civil action in the Circuit Court of Kanawha County, West Virginia, making a similar complaint as that made in this Court. . . .

That action was summarily dismissed by Order of the Honorable George M. Scott, Circuit Judge Sitting by Special Designation, dated June 13, 2002, which Order stated that the Circuit Court of Kanawha County, West Virginia "lacks subject matter jurisdiction or authority to overrule or modify or otherwise rule upon the validity of the October 12, 2001 Administrative order." . . . .

Inasmuch as the state courts have already spoken, and declined even to exercise jurisdiction in any sense, plaintiff brought this action in the United States District Court.  When this Court dismissed the plaintiff's complaint, but allowed him to pursue claims in a state court, he was "whipsawed" between two courts, neither of which would take his case.

(Pl.'s Mot. to Reinstate Clms. at ¶¶ 3-5).  Osborne attaches both the state court complaint and Judge Scott's dismissal order.

On September 29, 2003, the court dismissed this action ("the appealed order").  On September 27, 2005, the court of appeals' affirmed in part the appealed order and vacated it in part.  The vacated portion was narrow.  The court of appeals concluded that one could fairly ascertain Osborne's intentions in the enigmatic pleading to sue the judges in their individual, as well as their official, capacities.  The court of appeals thus vacated the appealed order to that extent and remanded the case

for consideration of the individual capacity claims against the judges.

On December 1, 2005, the court conducted a status conference with counsel.  The non-descript nature of the complaint caused the court to require Osborne to "file a short and plain statement of the claim(s) in the complaint he intended to pursue on remand."  Osborne v. King, No. 2:02-1250, slip op. at 2 (S.D. W. Va. Dec. 1, 2005).  This anticipated filing was to take "account of the court's prior order, unappealed, dismissing his state law claims without prejudice."  Id.  The judges were given leave in the same order to file their renewed dispositive motion on the questions of judicial and qualified immunity.

In addition to filing his "Notice of Claims" as contemplated by the December 1, 2005, order, plaintiff additionally moved (1) to amend the complaint to add a request for reinstatement to his former position, and (2) to reinstate the state law claims previously dismissed by the appealed order.  Although the Notice of Claims attempts to allege six separate "claims" for relief, it appears the only properly pled claim is one seeking redress for the putative violation of Osborne's federal "due process and equal protection" guarantees.[1]

---

[1]Plaintiff suggests that his "due process and equal protection rights" were violated not only in their constitutional (continued...)

As construed by the court, the motion to reinstate seeks to restore previously dismissed claims for (1) violation of Osborne's due process and equal protection rights under the West Virginia Constitution, (2) defamation, (3) termination in violation of a substantial public policy pursuant to <u>Harless v. First National Bank</u>, 162 W. Va. 116, 116, 246 S.E.2d 270, 271 (1978), and (4) intentional and negligent infliction of emotional distress.

II.

A.   The Rule 12(b)(6) Standard

A motion to dismiss pursuant to Rule 12(b)(6) should not be granted "unless it appears certain that the plaintiff can

---

[1](...continued)
form but "pursuant to . . . federal statutes and laws." (Pl.'s Mot. to Reinstat. ¶ 1).  The court deems this additional language to be surplusage.  Although the court can divine Osborne's intent to utilize the Fourteenth Amendment as the constitutional basis for his alleged deprivations of due process and equal protection, Osborne does not identify any other statutory or legal analogues for the claims.  The same is true for Osborne's similar allegation that the judges "violated [h]is <u>statutory</u> rights not be [sic] to be discriminated against on the basis of his political affiliation and his right to associate with those of his choosing."  (<u>Id.</u> at 2-3) (emphasis supplied).  The court is unaware of any such statutory rights.

prove no set of facts which would support . . . [his] claim and would entitle . . . [him] to relief." Greenhouse v. MCG Capital Corp., 392 F.3d 650, 655 (4th Cir. 2004) (quoting Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)). Additionally, the "complaint [is viewed] in the light most favorable to the plaintiff and . . . all well-pleaded allegations" are accepted as true. South Carolina Dept. of Health & Environ. Control v. Commerce & Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)). Further, beyond the facts alleged, the court is required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

A complaint need not "make a case" against a defendant or "forecast evidence sufficient to prove an element" of the claim. Chao v. Rivendell Woods, Inc., 415 F.3d 342, 349 (4th Cir. 2005) (quoting Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002)). Rather, it need only "allege facts sufficient to state elements" of the claim. Id.; Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

B.   Judicial Immunity

### 1.   Governing Standard

It is settled law that judges are absolutely immune from damage claims arising out of the discharge of their duties. See generally Bradley v. Fisher, 80 U.S. (13 Wall.) 335 (1872); Stump v. Sparkman, 435 U.S. 349 (1978).  King v. Myers, 973 F.2d 354, 356 (4th Cir. 1992).  There are conditions attached, however, to this all-encompassing grant of immunity.  Id.  First, the judge's action cannot have been undertaken in the "clear absence of all jurisdiction."  Id. (quoting Stump, 435 U.S. at 357).  Second, the challenged act must be a "judicial" one.  Id. As noted by our court of appeals in King, the second condition has two components: "[1] whether the function is one normally performed by a judge, and [2] whether the parties dealt with the judge in his or her judicial capacity."  Id.

Of particular relevance is Forrester v. White, 484 U.S. 219 (1988).  The similarities between Forrester and this action are noteworthy.  In Forrester, a state judicial officer, pursuant to the authority vested in him by state law, terminated a

10

probation officer.  The officer later alleged she was discharged on the basis of her gender.

The district court granted the state judicial officer absolute immunity, a decision affirmed by a divided panel of the United States Court of Appeals for the Seventh Circuit.  Judge Posner dissented though, concluding that "judicial immunity should protect only adjudicative functions, and that employment decisions are administrative functions for which judges should not be given absolute immunity."  Id. at 222.

The Supreme Court first noted that "[d]ifficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges."  Id. at 227.  The court noted "an intelligible distinction between judicial acts and the administrative . . . functions that judges may on occasion be assigned by law to perform."  Id.  The Supreme Court concluded that administrative decisions "have not . . . been regarded as judicial acts."  Id.  For that reason, the panel decision was reversed and Judge Posner's approach received the High Court's approbation:

> In the case before us, we think it clear that
> Judge White was acting in an administrative capacity
> when he demoted and discharged Forrester.  Those

11

> acts -- like many others involved in supervising court
> employees and overseeing the efficient operation of a
> court -- may have been quite important in providing the
> necessary conditions of a sound adjudicative system.
> The decisions at issue, however, were not themselves
> judicial or adjudicative.  As Judge Posner pointed out
> below, a judge who hires or fires a probation officer
> cannot meaningfully be distinguished from a district
> attorney who hires and fires assistant district
> attorneys, or indeed from any other Executive Branch
> official who is responsible for making such employment
> decisions.  Such decisions, like personnel decisions
> made by judges, are often crucial to the efficient
> operation of public institutions (some of which are at
> least as important as the courts), yet no one suggests
> that they give rise to absolute immunity from liability
> in damages under § 1983.

Id. at 229.


## 2. Analysis


The judges attempt to distinguish Forrester, contending

they, unlike the state judicial officer in that case, did not

have the authority to terminate Osborne.  The judges assert

> an employee of the Kanawha County Commission was
> determined by all seven judges . . . to be affecting
> the integrity of the home incarceration program.
> Consistent with the oversight role established by the
> West Virginia Legislature and their inherent powers,
> the . . . [j]udges entered the October 2001 Order.
> Only a judicial act could address the issues raised by
> the circumstances, and the . . . [j]udges acted in
> their judicial capacity by entering a written order
> that was directed to the . . . Commission to remove the
> Plaintiff from his position . . . .

(Defs.' Memo. in Supp. at 9-10).

12

The analysis, however, does not support a finding the judges engaged in a judicial act.  There is simply no basis to conclude that the function here undertaken by the judges was one normally performed by judges where the affected parties deal with them in their judicial capacity.  Instead, like the judicial officer in <u>Forrester</u>, the administrative order involved the termination of a court functionary by the judges overseeing the efficient operation of their court.  This supervisory act was doubtless quite important to effect the necessary conditions of a sound system of adjudication.  The actions at issue, however, were clearly not judicial or adjudicative in nature.

Contrary to the judges' assertion, when viewed in a light most favorable to Osborne, the judges ordered that he be relieved forthwith and named his interim replacement.  These facts align very closely with those presented in <u>Forrester</u>.  The court, accordingly, concludes that the judges are not entitled to judicial immunity.

13

C.    Qualified Immunity


                    1.    Governing Standard


        A two-step process governs the analysis of whether

public officials are entitled to qualified immunity.   The Supreme

Court summed up the inquiry in <u>Saucier v. Katz</u>, 533 U.S. 194,

201-02 (2001):

        A court required to rule upon the qualified
        immunity issue must consider, then, this threshold
        question: Taken in the light most favorable to the
        party asserting the injury, do the facts alleged show
        the officer's conduct violated a constitutional right?
        . . . .

        If no constitutional right would have been
        violated were the allegations established, there is no
        necessity for further inquiries concerning qualified
        immunity. On the other hand, if a violation could be
        made out on a favorable view of the parties'
        submissions, the next, sequential step is to ask
        whether the right was clearly established. This
        inquiry, it is vital to note, must be undertaken in
        light of the specific context of the case, not as a
        broad general proposition . . . .

        In this litigation, for instance, there is no
        doubt that . . . [it is] clearly establishe[d] . . .
        that use of force is contrary to the Fourth Amendment
        if it is excessive under objective standards of
        reasonableness. Yet that is not enough. Rather . . .
        "that the right the official is alleged to have
        violated must have been 'clearly established' in a . .
        .  particularized, and hence more relevant, sense: The
        contours of the right must be sufficiently clear that a
        reasonable official would understand that what he is
        doing violates that right."   The relevant, dispositive

                              14

> inquiry in determining whether a right is clearly
> established is whether it would be clear to a
> reasonable officer that his conduct was unlawful in the
> situation he confronted.

Saucier v. Katz, 533 U.S. 194, 201-02 (2001) (citations omitted).


### 2.  Step One--Did Plaintiff Suffer the Deprivation of a Constitutional Right?[2]


Saucier first requires the determination of whether the state actor violated the non-movant's constitutional rights.  The facts alleged by the non-movant are deemed true and he is entitled to the benefit of all reasonable inferences.  The court's analysis here is aided substantially by our court of appeals' recent decision in Ridpath v. Board of Governors Marshall University, 447 F.3d 292 (4th Cir. 2006).  Ridpath claimed, like Osborne here, that certain state actors violated his Fourteenth Amendment right to due process.  Specifically, he contended that by placing a "corrective action" label on his employment reassignment form, the defendants "knowingly foreclosed his career opportunities . . . without allowing him an

---

[2]The court addresses here only the procedural due process claim.  Osborne has made no attempt to either develop his equal protection theory or to respond to the judges' contention that they are entitled to qualified immunity on the claim.  The court, accordingly, deems the claim abandoned.

opportunity to defend himself." <u>Id.</u> at 308.  The precise right

allegedly violated in that case, as here, was "the right to

procedural due process when governmental action threatens a

person's liberty interest in his reputation and choice of

occupation."[3]  <u>Id.</u> at 307.

The elements for such a "stigma-plus" claim can be

gleaned from a variety of Supreme Court decisions from <u>Board of</u>

<u>Regents v. Roth</u>, 408 U.S. 564 (1972) to <u>Siegert v. Gilley</u>, 500

U.S. 226, 232-33 (1991).  One respected civil-rights commentator

lists the elements as follows:

    1.    <u>stigma</u> imposed by government;
    2.    in <u>conjunction</u> with;
    3.    deprivation of a <u>tangible interest</u>, the "<u>plus</u>";
    4.    <u>publication</u> of the stigmatizing charges;
    5.    <u>alleged</u> to be <u>false</u>;
    6.    <u>denial</u> of a <u>name-clearing hearing</u>.

---

[3]The judges take a more narrow view of Osborne's non-
descript pleading.  They appear to contend that Osborne was an
at-will employee lacking a property interest in his continued
employment sufficient to support a Fourteenth Amendment due
process claim.  Although that would appear to be true, as it was
in <u>Ridpath</u>, <u>id.</u> at 307 n.14, Osborne has also alleged a claim
under the liberty-interest component of the Fourteenth Amendment.
    The court notes additionally that plaintiff has done little
to develop the property interest component of his due process
claim.  At summary judgment, it will be incumbent upon plaintiff
to support the claim or suffer its dismissal.

1 Martin A. Schwartz, <u>Section 1983 Litigation</u> §3.05[C] (4th ed. 2006) (emphasis in original).[4]

As noted, in ascertaining whether a constitutional deprivation has been successfully asserted, the court treats the facts alleged by Osborne as true.  Regarding the first element, the administrative order arguably attached a stigma to Osborne in two separate ways.  Viewed in the light most favorable to Osborne, the administrative order serves to place official imprimatur on the allegation that Osborne did utter a reprehensible racial epithet in regard to an individual under his supervision.  The allegation that Osborne referred to the

_____

[4]This formulation of the elements appears consistent with our court of appeals' approach in <u>Ridpath</u>:

[T]he allegations of Ridpath's Amended Complaint and the reasonable inferences drawn therefrom establish that the Administrators publicly made a false charge against Ridpath, connoting dishonesty and other serious character defects on his part, in the course of subjecting him to a significant demotion to a position outside his field of choice. Moreover, it is undisputed that the Amended Complaint reflects that Ridpath was not provided notice or an opportunity to be heard with respect to this charge. Ridpath therefore has sufficiently alleged the violation of his Fourteenth Amendment right to due process when a liberty interest is at stake. And, thus, the allegations underlying his due process claim satisfy the first prong of the qualified immunity test.

<u>Ridpath</u>, 447 F.3d at 313.

individual as "just a no-good nigger" would draw into grave question his fitness to serve evenhandedly in a supervisory capacity, especially one involving the supervision of those of African-American descent.  Indeed, the use of such degrading language under the circumstances related here is, at a minimum, an attack on one's integrity and honor.  Some might view it more seriously, as implying that the declarant possesses a "serious character defect . . . ."  <u>Ridpath</u>, 447 F.3d at 308.[5]

Aside from this comment, however, the administrative order, again viewed in a light most favorable to Osborne, suggests the specter of misconduct on his part beyond mere mismanagement or incompetence:

> WHEREAS, numerous complaints have been received from persons within the judiciary, offenders, and other persons relating to the conduct of Earl Osborne as the home incarceration supervisor and the manner in which he administers the program, some of which are potentially subject to investigation . . . .

---

[5]Although <u>Ridpath</u> mentioned only the most frequently alleged character defects of "dishonesty or immorality[,]" our court of appeals has also suggested that an attack on an individual's "integrity or honor" are sufficient for purposes of advancing a due process claim.  <u>Robertson v. Rogers</u>, 679 F.2d 1090, 1092 (4th Cir. 1982).  One's integrity and honor would certainly appear to suffer from the official recognition of that person's use of racial epithets.

(Order at 2, attached as Ex. B. to Compl.)  The two allegations
taken together are minimally sufficient to satisfy the first
element at this stage of the litigation.[6]

Second, the stigma must have been imposed in
conjunction with the deprivation of a tangible interest.  That
element is satisfied as well.  The order directed that Osborne
"be relieved forthwith as the supervisor of the home

_____

[6]The circumstances here are distinguishable from those in
Jackson v. Long, 102 F.3d 722 (4th Cir. 1996).  In Long, a
sheriff terminated two employees accused of wrongdoing in
relation to an assault on an inmate.  The sheriff conducted an
investigation into the inmate's complaint, including polygraph
examinations, which indicated the allegations were trustworthy.
The sheriff then terminated the two employees and "accurately
reported the complaint and his actions" to the media.  Id. at
729.  The sheriff also reported that the employees could reapply
for their jobs if they were subsequently cleared of any
wrongdoing.  The court of appeals noted that "[n]o one has
alleged that [the] [s]heriff . . . falsely reported the complaint
or his actions."  Id.  The court of appeals concluded that the
sheriff's "dismissal of [the employees] . . . and his
announcement of a criminal investigation [did not] violate[]
clearly established constitutional rights."  Id. at 731.
    A number of distinguishing factors are present here.  First,
no investigation is shown to have been conducted by the judges.
Second, by mandating the termination of Osborne, and not
providing a means to reapply if he were ultimately cleared of
wrongdoing, the judges effectively placed their imprimatur upon
the truth of the damaging allegations.  Third, it is of some note
that the accuser in this case was, unlike in Jackson, an officer
of the court and a public employee himself.  This lends an
additional flavor of official stigma here that was not present in
Jackson.

19

incarceration program" and named John J. Myatt as his interim
replacement.

Third, the contents of the administrative order were
publicized and appeared in the local news media.  Finally,
Osborne contends the stigmatizing charges were false and that his
requests for a hearing to clear his name have been denied.

Based upon the foregoing, the court concludes that
Osborne has adequately alleged the violation of his Fourteenth
Amendment right to procedural due process.  He has, accordingly,
satisfied the first requirement of overcoming the judges'
qualified immunity request.

 2.  Step Two--Was the Constitutional Right Clearly Established?

The next step examines whether the Fourteenth Amendment
right allegedly violated  was a clearly established one of which
a reasonable person would have known.  Again, Ridpath provides
the parameters for making this determination:

> The key events alleged here -- the labeling of
> Ridpath's reassignment outside the Department of
> Athletics as a "corrective action" without giving him
> notice or a hearing -- occurred in late 2001. At that
> time, the state of the law was such that the
> Administrators were on notice that their conduct
> infringed on a liberty interest held by Ridpath,

20

rendering their failure to provide him with procedural
safeguards a violation of his Fourteenth Amendment
right to due process. Indeed, decades earlier, in its
decision in <u>Board of Regents v. Roth</u>, the Supreme Court
recognized that "notice and an opportunity to be heard
are essential" when a public employee's liberty
interest is infringed by a charge implying such serious
character defects as "dishonesty[ ] or immorality"
lodged in the course of an injury such as failure to
rehire.  In the wake of <u>Roth</u> and its progeny, we have
reiterated and expounded on the requirements of such a
liberty interest claim on numerous occasions.

    We have provided, in several decisions, concrete
examples of the types of public statements implying the
existence of serious character defects such as
dishonesty and immorality.  Of course, none of these
decisions involved the use of the "corrective action"
label in the course of an NCAA investigation. However,
there is no logical distinction between, for instance,
linking an employee's discharge to an investigation of
financial irregularities and tying Ridpath's
reassignment from the Department of Athletics to the
University's serious NCAA rules violations (as the
"corrective action" label served to do). In each of
these scenarios, the charge at issue can be understood
to insinuate dishonesty and other serious character
defects. Thus, our precedent gave the Administrators
fair warning that the "corrective action" label was
just the type of charge that implicates a protected
liberty interest.

    Similarly, we have specified that a public
employer's stigmatizing remarks may infringe on an
employee's liberty interest if such remarks are "made
in the course of a discharge or significant demotion."
. . . . The Administrators therefore were provided with
fair and clear warning that, by banishing Ridpath from
the Department of Athletics, they were unlawfully
subjecting him to a "significant demotion" within the
meaning of Stone and authorities relied on therein.

    Finally, because it is undisputed that Ridpath was
not provided any procedural safeguards with respect to
the labeling of his reassignment as a "corrective

21

action," it cannot be questioned that the
Administrators contravened Roth's requirement for
"notice and an opportunity to be heard."  Accordingly,
accepting the allegations of the Amended Complaint as
true, the Administrators contravened a clearly
established Fourteenth Amendment procedural due process
right of which a reasonable person would have known.
They therefore are not entitled to qualified immunity
at this stage of these proceedings on Ridpath's due
process claim.

Id. at 313-14 (citations omitted).

Ridpath clarifies that, in late 2001, it was clearly

established law that a public employer could not, in concert with

a termination decision, falsely and publicly accuse one of its

employees of possessing a stigmatizing character defect without

providing both notice and an opportunity to be heard.  Osborne's

complaint is fairly read as alleging just such a circumstance in

this action.  The court concludes that the judges have not shown

entitlement to qualified immunity at this stage of the case.

The court, accordingly, ORDERS that the renewed motion to dismiss

be, and it hereby is, denied.


C.   Motion to Amend


          1.   Governing Standard


          Osborne asks to amend his complaint for the purpose of

adding a claim for reinstatement to his former position.

22

Federal Rule of Civil Procedure 15(a) permits amendment of a complaint after a responsive pleading has been filed "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  In its most recent discussion of Rule 15(a), our court of appeals observed as follows:

> Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing. A common example of a prejudicial amendment is one that "raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial."  An amendment is not prejudicial, by contrast, if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred.

Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006) (citations omitted).

In addition to Rule 15(a), Rule 16(b) provides that "a schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge."  Fed. R. Civ. P. 16(b).  Rule 16(b) specifically contemplates the establishment of a deadline for joining "other parties and . . . amend[ing] the pleadings."  Fed. R. Civ. P. 16(b).

Seven courts of appeal have discussed the interplay between Rules 15(a) and 16(b) when a pleading amendment has been sought following expiration of the court-imposed deadline for such modifications.  In each instance, the reviewing appellate courts have accorded primacy to Rule 16(b).  See Leary v. Daeschner, 349 F.3d 888, 908-09 (6th Cir. 2003); S & W Enterprises, L.L.C. v. SouthTrust Bank of Alabama, NA, 315 F.3d 533, 536 (5th Cir. 2003); Parker v. Columbia Pictures Industries, 204 F.3d 326, 342 (2nd Cir. 2000); In re Milk Prods. Antitrust Litig., 195 F.3d 430, 437 (8th Cir. 1999); Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam); Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 610 (9th Cir.1992); Riofrio Anda v. Ralston Purina Co., 959 F.2d 1149, 1154-55 (1st Cir. 1992). 3 Daniel R. Coquillette, Moore's Federal Practice § 16.13 (3rd ed. 2005) (footnotes omitted) ("Once a district court . . . establishes a time table for amending pleadings, Rule 16's standards control. In such a setting, the need to support effective case management trumps the general pleading rules. Therefore, even if an amendment would be permitted under Rule 15 standards, a party may not add a claim or defense after a

24

deadline fixed in a scheduling order without first making a showing of good cause.").[7]

In <u>Leary</u>, the most recent appellate decision to have confronted the issue, the United States Court of Appeals for the Sixth Circuit explained both the rationale for its holding and the proper application of Rule 16(b):

> More than twenty years after the Court's decision in Foman[<u>v. Davis</u>, 371 U.S. 178, 182 (1962)], the 1983 amendments to the Federal Rules of Civil Procedure altered Rule 16 to contain a provision restricting the timing of amendments. Rule 16 states, in relevant part: "the district judge . . . shall, after receiving the report from the parties under Rule 26(f) . . . enter a scheduling order that limits the time (1) to join other parties and to amend the pleadings . . . ." The Rule is designed to ensure that "at some point both the parties and the pleadings will be fixed." Fed.R.Civ.P. 16, 1983 advisory committee's notes.  The Rule permits modification to the scheduling order "upon a showing of good cause and by leave of the district judge." But a court choosing to modify the schedule upon a showing of good cause, may do so only "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed.R.Civ.P. 16, 1983 advisory committee's notes.  Another important consideration for a district court deciding whether Rule 16's "good cause" standard

---

[7]Our court of appeals has not squarely confronted in a published opinion the interaction between the two rules.  In its most recent mention of Rule 16(b) in this setting, however, it appears to have at least implicitly noted the rule's potential applicability in cases where the deadline for amended pleadings has passed.  <u>Laber</u>, 438 F.3d at 427 n.23 ("The Army does not argue that we should apply the 'good cause' legal standard in Fed.R.Civ.P. 16(b) because Laber's motion to amend came after the deadline set in the scheduling order issued in this case.  We therefore do not consider the issue.").

> is met is whether the opposing party will suffer
> prejudice by virtue of the amendment.

**Leary**, 349 F.3d at 905 (some citations omitted).  Diligence of
the moving party, and prejudice, are thus paramount
considerations under Rule 16(b).

### 2.  Analysis

On November 27, 2002, the court set a December 20,
2002, deadline for Osborne to amend his pleading.  This date was
not modified in the scheduling order subsequently entered on
January 17, 2003.  Thus, December 20, 2002, became the pleading
amendment deadline contemplated by Rule 16.  In the appealed
order, the court observed "plaintiff seeks only economic damages
including compensatory and punitive damages and does not seek
reinstatement to his former position as home incarceration
supervisor."  (Appealed Order at 6-7).  Following the filing of
the complaint in October 2002, and the entry of the appealed
order in September 2003, Osborne never moved to amend his
pleading for any reason until the filing of the instant motion in
December 2005 seeking to amend the complaint to add a request for
reinstatement to his former position.

26

Since the filing of the complaint, a party necessary for accomplishing the requested reinstatement of Osborne to his former position, namely, the County Commission, has now exited the case.  As noted in section 62-11B-7a, the County Commission is the plaintiff's employer, or at least an entity with joint employment authority along with the judges.  W. Va. Code § 62-11B-7a ("The county commission may employ one or more persons . . . as a home incarceration supervisor").  Additionally, the only parties to this action are the judges, each of whom is sued only in an individual capacity.  In that limited capacity, the judges individually lack the authority to provide "the approval of the circuit court" required by section 62-11B-7a.

Aside from these rather significant substantive obstacles to the relief sought, Osborne offers little explanation why he has moved so dilatorily in seeking this rather substantial amendment.  Inasmuch as he has failed to demonstrate good cause to justify alteration of the pleading amendment deadline, or to demonstrate the requested amendment would not be futile, the court ORDERS that the motion to amend be, and it hereby is, denied.

D.   Motion to Reinstate Claims


        In his motion to reinstate claims, Osborne seeks to add
anew those state claims previously dismissed by the court in the
appealed order after the federal claims dropped away.  As noted,
Osborne did not appeal the court's discretionary dismissal of the
state claims.  In view of this posture, the court deems it
necessary for Osborne to move formally to amend his pleading to
add these now-dismissed claims.  If Osborne so moves, he must
make the showing required by both Rules 15(a) and 16(b).
Inasmuch as that showing is presently lacking, the court ORDERS
that the motion to reinstate claims be, and it hereby is, denied.


                            III.


        Based upon the foregoing discussion, the court ORDERS
as follows:

    1.   That the judges' renewed motion to dismiss be, and it
         hereby is, denied; and

    2.   That Osborne's motions to amend the complaint and to
         reinstate claims be, and they hereby are, denied.



                            28

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED:  August 15, 2006

John T. Copenhaver, Jr.
United States District Judge